954 F.2d 1147
 Thomas Sawyer McCARTHNEY; Timothy Ray Buchanan; Eustaquio
Colon; Mary Elizabeth Devoe; James Christopher
Everett; Bobby Towns; William Gary
Woods, Petitioners,
v.
James B. BUSEY, Administrator, Federal Aviation
Administration; the National Transportation
Safety Board, Respondents.
 No. 91-3097.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 20, 1991.
Decided Jan. 23, 1992.
Rehearing Denied Feb. 27, 1992.
 
 Michael A. Kessler (Argued and Briefed), Kessler & Sparks, Atlanta, Ga., for petitioners.
 Mardi R. Thompson, Federal Aviation Admin., Office of General Counsel, Joseph A. Conte (Argued and Briefed), Federal Aviation Admin., Office of Chief Counsel, Washington, D.C., Barbara Smith, Office of Nat. Transp. Safety Bd., General Counsel's Office, Washington, D.C., for respondents.
 AMENDED OPINION
 Before KENNEDY and SUHRHEINRICH, Circuit Judges; and WELLFORD, Senior Circuit Judge.
 WELLFORD, Senior Circuit Judge.
 
 
 1
 After an investigation of Omni Aviation, Inc. (Omni), respondent Busey, Administrator of the Federal Aviation Administration (FAA), issued, on October 19, 1990, seven emergency orders of revocation of airmen certificates against petitioners McCarthney (chief executive officer of Omni), Buchanan, Colon, Devoe, Everett, Towns, and Woods, flight instructors affiliated with Omni. The revocation orders charged all seven petitioner pilots with making intentionally false or fraudulent entries in official records in violation of § 61.59(a)(2) of the Federal Aviation Regulations, 14 C.F.R. § 61.59(a)(2).[1] These orders reflected complaints filed under rules of practice of the National Transportation Safety Board (NTSB) against each of the petitioners. Each indicated that the Administrator had "determined that an emergency exists in the subject case and safety in air commerce or air transportation and the public interest require the immediate effectiveness of his Emergency Order."
 
 
 2
 The emergency orders were served by certified mail on the petitioners, sent with a cover letter, October 26, 1990, to the Office of Judges of the NTSB at Vienna, Virginia from the Atlanta regional office of the FAA. A representative of the FAA certified on each of the seven separate letters that on October 26 a copy of the letter and the revocation order applicable to each separate petitioner had been mailed to their attorneys, Kessler & Sparks, of Atlanta, Georgia, and to the petitioners in Tennessee.
 
 
 3
 We summarize the charges in each complaint:
 
 1. McCarthney (chief instructor)
 
 4
 a. falsification of other pilots' records; BankAir flights[2] on 8 occasions in 1989;
 
 
 5
 b. operation of a flight with Towns, an unauthorized pilot.
 
 2. Buchanan
 
 6
 a. falsification of his pilot logbook on a September 6, 1989 BankAir flight falsely claiming 6 hours of flight time.3. Colon
 
 
 7
 a. falsification of student records--Joyner and Cairns in 1990;
 
 
 8
 b. falsification of his pilot logbook--BankAir flights on 16 occasions in 1989.
 
 4. Devoe
 
 9
 a. failure or refusal to present her "first pilot logbook" to the FAA for inspection;
 
 
 10
 b. falsification of her pilot logbook; student flights on many occasions from 1988 through 1990;
 
 
 11
 c. similar falsification on 4 BankAir flights;
 
 
 12
 d. false entries in hours claimed in additional instructor rating application.
 
 5. Everett
 
 13
 a. falsification of pilot logbook; student flights on 13 occasions in 1989;
 
 
 14
 b. similar falsification of pilot logbook on 5 BankAir flights in 1989 and 1990.
 
 6. Towns
 
 15
 a. falsification of student records of Franklin Cairns on April 7, 1990;
 
 
 16
 b. serving as a pilot crewmember on an Omni plane when "not qualified" on March 19, 1990;
 
 
 17
 c. logging excessive and intentionally false times on BankAir flights.
 
 7. Woods
 
 18
 a. falsification of pilot logbook; BankAir flights (excessive hours claimed on 14 occasions in 1989 and 1990).
 
 
 19
 An FAA investigation of Omni allegedly began in conjunction with the latter's application for a permanent Part 141 flight school certificate. The FAA asked that each petitioner produce personal logbooks; McCarthney did not produce one claiming to have recorded elsewhere "items he was required to record under these regulations." The FAA makes no contention to the contrary. Others complied except Devoe as to one logbook.
 
 
 20
 After the investigation, including examination of the logbooks and records, the FAA charged "numerous false entries in the petitioners' private logbooks which involved either flights on which they were instructors or flights for ... BankAir."[3] Petitioner Colon admitted the charges of false entries concerning students Joyner and Cairns. Towns, on the other hand, admitted only a "mistake in that the stage check actually occurred but was entered in the wrong student's logbook."[4] Everett responded that "a number of flights were mistakenly entered in his logbook as airplane time when they actually should have been logged as simulator time," or "errors ... in transferring time into his logbook from notes."[5] Devoe explained that there were "errors caused by poor bookkeeping and delays in putting time in her logbook."[6] Petitioners aver that the bulk of the BankAir claims involved their inclusion of "taxi time and ground time" as part of the logged time, not just "air" time,[7] and that their entries challenged by the FAA were therefore neither intentionally false nor fraudulent. They complain that the FAA, during its investigation, refused to meet with McCarthney and to discuss the charges or allegations of wrongdoing with petitioners concerned in order to consider their explanations. They assert "a total failure to communicate with Omni ... from March through October of 1990."[8]
 
 
 21
 Petitioners employed joint counsel and appealed the emergency orders to the NTSB very promptly. Each appeal was received by the Board by October 26, 1990, and received docket numbers SE-11435 through SE-11441, inclusive. On October 26, the Administrator moved to consolidate each of the separate appeals pursuant to Rule 14 of the NTSB's practice. (October 26 was a Friday.) The assistant chief counsel in Atlanta certified on that same date that she or he "delivered by telecopier" the motion to consolidate. The Board stamped the notices of the 7 complaints with enclosed emergency orders of revocation from the FAA counsel as received on October 30, 1990. Administrative Law Judge (ALJ) Fowler was assigned to hear the appeal in Nashville, beginning November 13, 1990. ALJ Fowler entered an order of consolidation on October 26, 1990, in Washington, D.C. Petitioners filed answers to the complaints on October 31. On November 8, petitioners sought dismissal of all complaints for being "stale," but this motion was not granted.
 
 
 22
 At the conclusion of the hearing on November 16, 1990, the ALJ orally modified the FAA's emergency orders of revocation and, instead, issued 90-day suspensions to Buchanan, Wood, and Everett; a six-month suspension to Devoe; an eight-month suspension to Colon; and 60-day suspensions to Towns and McCarthney. On November 18, petitioners and the FAA appealed to the full Board. On December 28, 1990, the NTSB denied the appeals of each petitioner and reinstated the original emergency orders of revocation. Appeal to this court ensued with five assignments of error: (1) failure to affirm the ALJ's findings as supported by substantial evidence and unconstitutional rejection of his findings as to mitigation; (2) the NTSB's failure to act in a timely manner in accordance with law; (3) denial of due process rights prior to issuing the revocation orders; (4) immateriality of entries in question; and (5) failure of the NTSB to limit sanctions to "flight certificates held by the petitioners rather than all certificates."
 
 I. TIMELINESS
 
 23
 We consider first the timeliness of the actions of the NTSB, because if the NTSB failed to act in accordance with the requirements of 49 U.S.C.App. § 1429, and if the time requirements are deemed to be jurisdictional, we need not consider the remaining issues raised by petitioners.
 
 A. 60-DAY PERIOD NOT A BASIS FOR DISMISSAL
 
 24
 Petitioners devoted less than three pages of their 44-page brief to discussing this issue, but respondents gave considerable attention to this question. The pertinent part of the statutory language under consideration states that if:
 
 
 25
 [T]he Secretary of Transportation advises the National Transportation Safety Board that an emergency exists and safety in air commerce or air transportation requires the immediate effectiveness of his order, in which event the order shall remain effective and the National Transportation Safety Board shall finally dispose of the appeal within sixty days after being so advised by the Secretary of Transportation.
 
 
 26
 49 U.S.C.App. § 1429(a).
 
 
 27
 The statute mandates a sixty day period; petitioners assert that the NTSB did not meet this requirement, while the Board maintains that it did. The next sentence of the Act (copied in subsection (c)(3)) sets out that the person "substantially affected" by the NTSB order may obtain judicial review. No party cites a court decision interpreting this statutory provision. The NTSB adopted a rule, applicable to emergency proceedings such as these, which provides:
 
 
 28
 (b) Effective date of emergency. The procedure set forth herein shall apply as of the date when the Administrator's written advice of the emergency character of his order has been received by the Office of Administrative Law Judges or by the Board.
 
 
 29
 49 C.F.R. § 821.54(b).
 
 
 30
 Petitioners cite no case authority on the timeliness question nor do they cite any legislative history concerning that part of the statutory language with which we are concerned. They do cite 49 C.F.R. §§ 821.10 and 54(c) to the effect that Saturdays, Sundays, and legal holidays are counted and do not extend time requirements in the case of emergency proceedings. They assert that the NTSB "had notice of the Administrator's actions by not later than October 26, 1990 at which time letters were issued by the Board acknowledging receipt of the notices of appeal." ALJ Fowler consolidated the appeals by an order dated October 26, 1990. Petitioners argue, therefore, that the 60-day statutory period required the Board to act by Christmas Day of 1990. Since the NTSB's decision was not rendered until December 28, 1990, petitioners take the position that it came too late, and that we should consider the 60-day period to be a mandatory and jurisdictional mandate. Petitioners maintain finally that the NTSB's failure to take any timely action within 60 days resulted in its loss of jurisdiction to alter or amend the ALJ's prior decision which they assert then becomes the final administrative decision.
 
 
 31
 We believe that petitioners' timeliness claim is immaterial, regardless of whether the 60-day notice period began October 26, as claimed by petitioners, or October 30, as claimed by respondents. The general rule is that
 
 
 32
 [a] statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and specifies a consequence for failure to comply with the provision.
 
 
 33
 St. Regis Mohawk Tribe, New York v. Brock, 769 F.2d 37, 41 (2d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (quoting Fort Worth Nat'l Corp. v. FSLIC, 469 F.2d 47, 58 (5th Cir.1972), and citing other cases back to French v. Edwards, 80 U.S. (13 Wall) 506, 511 (1871)).
 
 
 34
 Petitioners have been able to point to no provision of the statute or pertinent regulation that requires the order of the ALJ to be considered final and unappealable if the NTSB fails to act within the 60-day period. Absent such a specific provision, we find no basis for holding that a failure of the NTSB to act within 60 days renders the ALJ decision final. Thus, we find petitioners' arguments unavailing on the timeliness question.
 
 B. BOARD'S ACTION NOT UNTIMELY
 
 35
 Respondents cite Administrator v. Wendler, 3 NTSB 3939, 3940 (1981), to the effect that filing of the "initial emergency order" with the Board and its receipt thereof marks "commencement of the 60 day period." They argue that the Board's stamp of receipt of the emergency order was dated October 30, 1990; that this was the day of commencement of the 60 day period, and therefore the NTSB decision filed December 28, 1990 was timely. Respondents maintain in their brief that written notification is required from the Administrator of the "emergency nature of the orders" before the 60 day period commences. Respondents' Brief at 31. Although § 821.54(b) of the regulations makes this a requirement, they point to no statutory language that maintains it must be in writing. This regulation conforms to the statutory scheme in cases of emergency orders and revocations and that it is an appropriate requirement to specify that the notice or "advice" be in writing. The 60 day period thus begins when written advice from the Secretary is received by the NTSB that an emergency action exists.
 
 
 36
 Respondents argue that the motion to consolidate, dated October 26, 1990, transmitted by telecopier "did not advise the NTSB of the emergency nature of the cases." Respondents' Brief at 31. Careful examination of the Administrator's notice to consolidate the seven cases filed by the regional assistant chief counsel indicates nothing in that order that any of the cases involved emergency orders; rather, they are described as follows:
 
 
 37
 1. The above-captioned cases all involve pilots who work for Omni Aviation, Inc., and involve flights made in Omni aircraft. Many of the factual issues involve flights in which Respondent McCarthney signed off instruction for other of the above respondents, which instruction did not in fact occur. Other incidents involve fights [sic] in which two or more of the above pilots have logged flight time for the same flight in an aircraft. It is essential that all cases be heard together to assure consistency and to fully develop the facts. Further, the same FAA counsel, the same witnesses, and one respondent's counsel, are involved for each case. Therefore, judicial efficiency will best be served by holding one hearing.
 
 
 38
 William E. Fowler, Jr., as chief judge, ordered the cases consolidated for hearing and decision, stating only as a basis therefor the:
 
 
 39
 full consideration of Administrator's Motion to Consolidate, and it having been established that the above captioned appeals all concern the same facts, the same witnesses, and the same counsel....
 
 
 40
 The Administrator's assistant regional counsel mailed seven letters by certified mail enclosing with each an emergency order of revocation pertaining to the particular petitioner, and advising that "[t]he Administrator has determined that an emergency exists" as to each. The seven letters with enclosures were stamped "N.T.S.B. Oct. 30 [times approximately 4:30 p.m.] LJ-1."
 
 
 41
 The individual notices of appeal filed with the Board do indicate that each is an "emergency order of revocation" and refer to a separate FAA number. Those seven notices of appeal were received by the NTSB on October 26, 1990. The notices were not, of course, from the Secretary of Transportation (as designated in 49 U.S.C.App. § 1429(a)) nor from the Administrator.[9] In my view, notices of appeal from petitioners meet neither the statutory nor the regulatory specifications as "advice from the Secretary" for the beginning of the running of the 60 day period. That there is concern about the lapse of time after an emergency order concerning aviation safety has been issued is borne out by the Board's rules providing for service of that document as a formal complaint upon the NTSB and the certificate holder within three days. 49 C.F.R. § 821.55(c). There is no question but that the Administrator and the NTSB met the requirements of 49 C.F.R. §§ 821.55(c) and 821.7(a) in serving the complaints in these consolidated cases. Petitioners' notice of appeal does not fit the mandated statutory notice to the NTSB to start the 60 day period for the Board's decision.
 
 
 42
 In view of the determination that consideration of the merits is not precluded by reason of petitioners' untimeliness claim, we need not decide whether a decision of the ALJ was a final agency decision in light of the absence of a timely Board order after appeal from the ALJ decision. ( Janka v. Dep't of Transportation and NTSB, 925 F.2d 1147 (9th Cir.1991), is not controlling because it deals with non-emergency orders of revocation.)
 
 
 43
 The asserted untimely action question does not bar our consideration of the merits, and, in the alternative, we conclude that the effective date was October 30, 1990. Petitioners have failed to establish a timeliness defense as a bar to our consideration of the NTSB actions in reinstating the revocations of license.
 
 II. VALIDITY OF NTSB REVOCATIONS
 A. Applicable Standards
 
 44
 Petitioners argue in their brief that there is substantial evidence to support the decisions of the ALJ with regard to temporary suspensions imposed. They seek, therefore, an affirmance of the ALJ actions on penalties rather than the revocations imposed by the NTSB. We find petitioners' test inapplicable under the circumstances of these consolidated appeals. Generally, NTSB decisions are judged on whether or not they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Winslow v. NTSB, 885 F.2d 615, 617 (9th Cir.1989). We review the NTSB decision in accordance with this standard. Factual findings by the NTSB are not to be disturbed on appeal if supported by substantial evidence. King v. NTSB, 766 F.2d 200 (5th Cir.1985); Western Air Lines v. CAB, 495 F.2d 145, 152 (D.C.Cir.1974). The latter decision held in this regard: "A conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." Id. The NTSB is the ultimate finder of fact. Cf. Chirino v. NTSB, 849 F.2d 1525, 1532 (D.C.Cir.1988).
 
 
 45
 We have only recently discussed the appropriate standard of review in Blackman v. Busey, 938 F.2d 659 (6th Cir.1991):
 
 
 46
 Judicial review of orders of the NTSB is provided for by 49 U.S.C.App. § 1903(d), which specifies that the review shall be in accordance with the provisions of the Administrative Procedure Act, particularly 5 U.S.C. § 706. Insofar as relevant to this case, that section provides that this court may set aside agency action if it finds it to be arbitrary, capricious, an abuse of discretion, or, where there has been a hearing, the agency action is unsupported by substantial evidence. "The findings of facts by the Board or Administrator, if supported by substantial evidence, shall be conclusive." 49 U.S.C. § 1486(e). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Board of Governors v. First Lincolnwood Corp., 439 U.S. 234, 253, 99 S.Ct. 505, 515 (1978); Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206-217 (1938); Hatfield v. Secretary of HHS, 743 F.2d 1150, 1158 (6th Cir.1984).
 
 
 47
 Id., 661.
 
 
 48
 The NTSB has plenary review authority with respect to ALJ decisionmaking. Janka v. Dep't of Transportation, 925 F.2d 1147, 1149 (9th Cir.1991). This review by the NTSB of the ALJ opinion is, therefore, on an entirely different basis from the nature of our review of the NTSB's decisions, particularly as to the penalty sanction imposed.
 
 
 49
 We are concerned in this appeal, then, as to whether certain factors which influenced the ALJ should have required the NTSB to reach a decision other than revocation of the pilot license as to each petitioner. It is evident that the ALJ relied upon testimony of good character and reputation for integrity of petitioners, or some of them, to change the original administrative sanction of revocation. The NTSB's weighing of the facts and factors which it determines upon review, based upon substantial evidence, is not to be disturbed by this court even if we feel that a different or less serious sanction might be indicated. Erickson v. NTSB, 758 F.2d 285, 290 (8th Cir.1985). "It does not matter that other reasonable conclusions are theoretically possible" (or even desirable from our standpoint). Blackman, at 662.
 
 
 50
 Revocation has been found to be an appropriate remedy by the NTSB and by this court for logbook falsifications. Administrator v. Cassis, NTSB Order EA-1831 (1982), aff'd, Cassis v. Helms, 737 F.2d 545 (6th Cir.1984). The NTSB has also recognized that mitigating circumstances might indicate a suspension rather than a revocation in a similar kind of situation. Administrator v. Fallon, NTSB Order EA-2678, 1988 NTSB LEXIS 22 (1988) ("not all falsification violations must result in revocation ... disclosure of a falsification [and confession] by an airman before its discovery ... deemed a mitigating factor") (but see also the dissenting opinion). Nonetheless, "[t]he Administrator has discretion to revoke a pilot's certificate." Blackman, at 662 (emphasis added).
 
 
 51
 We are not disposed to superimpose our judgment over the NTSB's weighing of acceptable mitigating factors and the exercise of its discretion, especially in the case where falsification has been established by substantial evidence as found both by the ALJ and the NTSB upon review.
 
 
 52
 We review the evidence as to each petitioner separately under these applicable standards. Initially, ALJ Fowler found "excessive" entries as well as "false" entries on "various logbooks" existed. ALJ Opinion R 993. The ALJ also concluded that "the Administrator has successfully proven, by a fair and reasonable preponderance a majority of the allegations set forth." Id. at 994 (emphasis added).
 
 1. McCarthney
 
 53
 First, the ALJ concluded, in effect, that McCarthney was qualified to hold a pilot's certificate. He found no violation as to him with respect to a Towns Part 135 flight. He found, however, that McCarthney endorsed pilot logbooks giving dual instruction time credits on check rides (charged in item B3 in the emergency order of revocation as to BankAir operations), eleven different flight entries charged to be "fraudulent or intentionally false ... in excess of the actual times flown, or ... [incorrect in that he] did not give instruction in [the specified] aircraft on [the specified] flight with [the specified] pilot." Thus, in considering specification B, only one of the two general falsification charges against McCarthney were sustained by the ALJ, and the lack of qualification charge was not sustained.
 
 
 54
 McCarthney testified that he permitted Devoe, a relatively inexperienced pilot, to fly certain of the flights in question when he, the instruction pilot, was not in either of the cockpit seats, but that she "possibly" had been exercising at some time dual control or "flying the airplane." J/A at 307.
 
 
 55
 He conceded that on a May 19, 1989 flight, while pilot-in-command, he signed pilot logs for Devoe and Wood indicating six hours for Devoe (the entire flight time) and almost five hours for Wood, both as "sole manipulator at the controls of the plane" at a time Devoe was unauthorized "to actually manipulate the controls." J/A at 311. McCarthney claimed he intended to give her six hours "dual" time for the flight when "more than likely" she did not have pilot-in-command time on the flight. J/A 312. He conceded, as he must have, that in the event Devoe claimed the entire flight time on this flight, Woods could hardly have claimed nearly five hours on this same flight, yet McCarthney approved both claims. (McCarthney was not sure Woods was qualified to serve as second in command.)[10] J/A at 313. McCarthney said with respect to other episodes charged that "we sat down and talked about it," but he did not intentionally falsify any entries or approve intentional falsifications, because the training pilots involved were in the planes with him, as a qualified instructor, during the entire time.
 
 
 56
 We conclude that the ALJ, despite his evident reluctance to find McCarthney liable on any charges, because he was "a pillar of the aviation community" in Nashville, found that there were false statements with regard to at least four different pilots flying under McCarthney's command where two or three pilots were given, or claimed, full flight time credit for flying an aircraft supposedly being operated by McCarthney. R 993 and J/A at 311-13. He found, in effect, approval of "excessive padding" of flight time claims as noted by FAA Inspector Sword as to a number of pilots here involved. It should also be noted that Devoe's testimony conflicted with McCarthney's on the six hour flight time credit on May 19, 1989, which appeared on her logbook and was "endorsed" by McCarthney.
 
 
 57
 We find substantial evidence to support the conclusion of the NTSB that McCarthney, in charge of the flight school and the BankAir operation, effectually approved "excessive flight time for flights that had been performed, and dual instruction [time] for periods during which [training pilots] were not at the controls of an aircraft." By clear inference, the ALJ held that many were "in essence" false statements, and he agreed that they constituted "excessive padding." McCarthney was in charge of the flight school and the other operations, and he endorsed what were found to be intentional falsifications in logbook records. We find the NTSB has the authority to determine revocation and that substantial evidence supported that decision as to McCarthney.[11] The NTSB also had the ultimate discretion to determine the weight to be given the testimony of character witnesses particularly on behalf of McCarthney.
 
 2. Buchanan
 
 58
 The ALJ made reference to a specific flight in September of 1989 (but on a different date than the revocation order specified). The revocation order charged Buchanan only with a single falsification of his pilot logbook--September 6, 1989, on a BankAir flight in which he allegedly falsely claimed a six hour credit.
 
 
 59
 The ALJ made reference only to a September 30, 1989 logbook entry with respect to a six hour claimed flight by Buchanan, which he found to be an intentionally false entry and determined a 90-day suspension period. At the same time, the ALJ found that Buchanan "was quite forthright and candid in his testimony," and he took this "into account" in amending the revocation order to a 90-day suspension. The basis for determining that the six hour entry was false was apparently that Towns, Devoe and Buchanan all claimed credit for a flight on which McCarthney was pilot-in-command.
 
 
 60
 Even if the ALJ made, or intended to make reference, to the same date as the alleged false entry charged against Buchanan, an assumption we decline to make, the finding that Buchanan was candid and truthful, coupled with Buchanan's testimony itself about the single episode in question, seems irreconcilable with the finding that the entry was intentionally false. Buchanan testified that for the six hours claimed as instruction that day he was on the plane and that he observed and asked questions which McCarthney answered. The entry itself was made by McCarthney and Buchanan did not believe it was a false entry when it was made. He testified that at the time the entry was made, he considered the hours shown to be flight instruction. We therefore would remand this question to the ALJ for clarification.
 
 
 61
 We are not satisfied concerning the revocation issued as to Buchanan under all the circumstances. It may be that he was found guilty of a charge on a date and on a flight not specified by the Administrator in the revocation order. Furthermore, revocation when the ALJ deemed Buchanan to be forthright and candid in his testimony may be inconsistent with a drastic penalty of revocation for a single offense. Accordingly, we STAY the revocation order issued by the NTSB as to Buchanan, and REMAND it for further consideration and clarification of the charge specified in the revocation order in light of the evidence adduced. The NTSB should set out with particularity findings and conclusions under the circumstances relative to Buchanan.
 
 3. Colon
 
 62
 The ALJ found, upon consideration of the evidence after the hearing, that "it might possibly be construed here that fraud was perpetrated by [this] Respondent," but this was not his determination, "taking into account the totality of the circumstances," including a finding that Colon also was "quite frank and candid." Colon conceded that he gave flight students Joyner and Cairns no stage check despite signing off to this effect, because he was satisfied with their proficiency. These records, then, despite Colon's candor, were "definitely false and intentionally so," and made by Colon while he was "the Chief Instructor" of Omni. In addition, the ALJ found intentional false entires "as set forth in page 3 of the Administrator's Order of Revocation" endorsed or made by Colon in his capacity as second-in-command at BankAir.
 
 
 63
 In view of the virtually undisputed and substantial evidence referring to a number of false entries, we find that the NTSB did not act illegally, arbitrarily, and capriciously, or abuse its discretion, in determining revocation as to Colon.
 
 4. Devoe
 
 64
 There was specific reference to Devoe by the ALJ as one involved in an excessive six-hour flight time declared by her, Towns, and/or Buchanan on September 30, 1989. One of the charged falsifications as to Devoe was September 30, 1989, in connection with a BankAir flight. Andrew DeVoe was among the students, in connection with whom Devoe, as an Omni flight instructor, allegedly made falsifications pertaining to student flights. There were 14 other students indicated as well.
 
 
 65
 The ALJ found that she had failed or refused to present her first pilot logbook for inspection contrary to FAR § 61.51(d)(1), which specifies:
 
 
 66
 § 61.51 Pilot logbooks
 
 
 67
 . . . . .
 
 
 68
 (d) Presentation of logbook. (1) A pilot must present his logbook (or other record required by this section) for inspection upon reasonable request by the Administrator, an authorized representative of the National Transportation Safety Board, or any State or local law enforcement officer.
 
 
 69
 The ALJ found, in addition, that "some of the entries" in her logbook were "intentionally false" and "in excess of the actual time flown." He found other entries to be mere reconstructed (or estimated) compilations on her part.[12]
 
 
 70
 There was clear and substantial evidence supporting the two separate types of violations alleged against Devoe, and there was evidence of numerous false entries in logbooks. We find no error or abuse of discretion in the action of the NTSB with respect to the ordered revocation of Devoe's license.
 
 5. Everett
 
 71
 The ALJ found that Everett did not operate a particular aircraft "on the date and for the times listed [on page 2 of the order of revocation]." The ALJ found Everett also to be "very candid and forthright" in his explanation about this discrepancy involving Omni student pilots, Child and Pearce, and training time with respect to charges about BankAir. The ALJ found "some of the entries in Respondent's logbook were intentionally false."
 
 
 72
 There is substantial evidence to support the findings of the NTSB with respect to intentionally false logbook entries by Everett despite (or because of?) his forthrightness in his testimony and discussion of the charges against him. We find no error or abuse of discretion with respect to the NTSB's order of revocation as to Everett.
 
 6. Towns
 
 73
 As in the case of other petitioners, Towns complains that FAA agents or investigators did not come to him for an explanation of the charges made against him with respect to certain logbook entries prior to the emergency order of revocation of his license. He found out about the investigation when applying to be a commercial pilot with Comair in early September 1989. Towns contended that the claimed false entries pertained to differences between logged air time and actual air time. This difference represented asserted ground time while awaiting instructions from the tower with respect to take-offs and delays after landing before proceeding to the final hangar or flight termination point. He apparently conceded, however, that there were flights in which there was a dispute about dual controls and claimed air time. One of the disputes also involved the claim duplication of six hours of flight time by Towns, Devoe, and Buchanan.
 
 
 74
 Towns admitted that on occasions he recorded flight time on a specific aircraft with named students erroneously when this time correctly should have been indicated as on a "simulator." He also conceded there were a "couple of dates ... [he] could not find ... in the simulator." He conceded, however, only "missing" 1.7 hours in this regard, and claimed that "most of the log hours" were "accurate." He also conceded that he did not make entries in the logbook contemporaneously with student flights. (Sometimes he made them 3 or 4 weeks afterward, "up to a couple of months.")
 
 
 75
 The ALJ found Towns "quite frank and candid," but found that he had recorded in the logbook that he had given a progress check to student Cairns when, in fact, he had not. The ALJ also found that Towns had flown with McCarthney on a flight for Omni for a customer and had improperly served as pilot "when not qualified to serve as a crew member" under pertinent regulations ("not a flight under Part 135 of the Federal Aviation Regulations.")[13]
 
 
 76
 In addition, the ALJ found as to Towns "some of the entries ... set forth in the Administrator's Emergency Order ... on page 3 ... were intentionally false." These were BankAir flights and "times logged were in excess of the actual times flown." Finally, the ALJ concluded that "student records filled out by the Respondent did contain intentionally false entries."
 
 
 77
 Under the circumstances and based upon the substantial evidence supporting the factual findings of both the ALJ and the NTSB, we find no abuse of discretion nor any legal error in the NTSB order of revocation as to Towns.
 
 7. Woods[14]
 
 78
 As in the instance of several other petitioners, the ALJ found Woods to be "quite forthright and candid," and he took this into specific account. The ALJ, nevertheless, found that "some of the entries" in his pilot logbook were "intentionally false." There was no specification by the ALJ as to whether there were only a few such false entries nor which of the fourteen alleged entries were false. Some of the purported discrepancies were large (over 6 1/2 hours in one instance (9/24), and over 5 hours on two dates when he did not fly (11/17 and 11/25)). Woods admitted that 2- 1/2 hours of that largest discrepancy, on September 24, 1988, was one he "should not have logged ... that's the only explanation," J/A 330. Apparently a segment of the hours logged was a check for some other pilot.
 
 
 79
 In the instance of the claimed 5- 1/2 hour logged flight (11/17/89), Woods conceded: "I made a mistake when I logged that." J/A 332, 333. The ALJ apparently accepted that explanation since she found only that some entries were in excess of the time actually flown. He admitted an error on the 11/25 date, but claimed to have corrected his logbook before its inspection. Woods complained that he was not given a chance to explain before the emergency order of revocation.
 
 
 80
 Woods did attempt explanations, however, for each of the errors charged in his log book relating to Hobbs meter records which appeared different from his own logged time. He maintained his records on a current basis and insisted that any discrepancy was unintentional, and, at most, a mistake of minor proportion. Woods testified that Hobbs meter entries must have been in error since it would be impossible to fly distances flown on these days in the hours recorded on the Hobbs meter. Woods also maintained that some discrepancies involved waiting time or ground movement time not reflected on the Hobbs meter. We believe the ALJ finding that Woods was candid and truthful was inconsistent with other ALJ findings in regard to him. We therefore remand to the ALJ for an explanation of his determinations about false entries as to Woods. We likewise STAY the revocation order as to Woods pending further considerations and clarification of the charges in light of the evidence adduced as to him on remand.
 
 
 81
 In sum, 49 U.S.C.App. § 1429(a) authorizes the Administrator to revoke a pilot's certificate if he determines that safety in air commerce and the public interest so require. The Administrator also has "broad discretion" to select a sanction "when public safety" concerns warrant emergency action on his part. Blackman, at 663.
 
 As noted with approval in Blackman, supra:
 
 82
 In Winslow v. Nat'l Transp. Safety Bd., 885 F.2d 615, 617 (9th Cir.1989), the court reviewed an NTSB decision overturning an administrative law judge's reduction of the sanction imposed by the Administrator for flying at too low an altitude. The court noted that "NTSB decisions, including decisions regarding sanctions, will be upheld unless they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " Id. (original emphasis). In reviewing sanctions, a "wide deference" must be given the agency's choice. Id. (quoting Holmes v. Helms, 705 F.2d 343, 374 (9th Cir.1983) (per curiam)). The court went on to reject the petitioner's arguments that sanctions for the violation of the same regulation must in every case be similar.
 
 
 83
 Id. at 662-63.
 
 
 84
 Each of the petitioners, except Buchanan and Woods, whose cases have been remanded for further determination, has failed, with respect to the original emergency orders, to demonstrate likelihood that the Administrator's decision was clearly erroneous or lacked a basis in fact. With respect to issuing emergency revocation orders, we have recently stated:
 
 
 85
 As the Administrator has broad discretion to select an appropriate sanction, he also has broad discretion to decide when public safety concerns warrant emergency action on his part. To show an abuse of that broad discretion, anyone "challenging the Administrator's emergency determination must demonstrate a substantial likelihood that the determination was 'a clear error of judgment' lacking any rational basis in fact. Nevada Airlines, Inc. v. Bond, 622 F.2d 1017, 1021 (9th Cir.1980)."
 
 
 86
 Blackman, supra, at 663 (emphasis added).
 
 
 87
 It cannot be said that the decision to issue the emergency revocation orders, in light of our discussion of the evidence (and the factual findings of the ALJ) lacked rational bases. Nor can it be said that there was not substantial evidence, except as to Buchanan and Woods, to support this drastic action as to each of the other petitioners. Each petitioner, represented by counsel, had a full, fair and prompt opportunity to challenge these actions, after notice, at a hearing. There was no denial of due process. We find no error in the conclusions of the ALJ and of the NTSB that the errors, falsifications, and padding which existed in the records and pilot logbooks were material entries as well as intentional falsehoods.
 
 
 88
 Finally, as we have already observed, the extent of the penalty and revocations imposed by the NTSB, including, in some cases, revocation of all certificates held by petitioners, was within the reasonable discretion of the NTSB in light of the totality of circumstances that exist in this case. There is no evidence that the NTSB failed to consider favorable or mitigating circumstances as to each petitioner as well as the adverse and aggravating factors found to exist.
 
 
 89
 We, therefore, AFFIRM the order of the NTSB in all respects, save as to Timothy Ray Buchanan and William Gary Woods, whose cases are REMANDED for the reasons and purposes indicated.
 
 
 90
 KENNEDY and SUHRHEINRICH, Circuit Judges, concurring.
 
 
 91
 We concur in all except part I.B. of Judge Wellford's opinion.
 
 
 
 [1]
 The pertinent part of this regulations reads as follows:
 § 61.59(a)(2) Falsification, reproduction, or alteration of applications, certificates, logbooks, reports, or records.
 (a) No person may make or cause to be made--
 (2) Any fraudulent or intentionally false entry in any logbook, record, or report that is required to be kept, made, or used, to show compliance with any requirement for the issuance, or exercise of the privileges, or any certificate or rating under this part....
 
 
 [2]
 BankAir is an air carrier flying freight and charter flights between Nashville and Atlanta. McCarthney was the pilot in charge and approved instructor for BankAir
 
 
 [3]
 Petitioners' Brief at 8
 
 
 [4]
 Petitioners' Brief at 9, 10
 
 
 [5]
 Petitioners' Brief at 10
 
 
 [6]
 Petitioners' Brief at 10
 
 
 [7]
 Petitioners' Brief at 11
 
 
 [8]
 Petitioners' Brief at 12
 
 
 [9]
 49 U.S.C. § 106(g) (Partial Rev.1990) specifies that the "Administrator shall carry out--(1) duties and powers of the Secretary relating to aviation safety...."
 
 
 [10]
 She indicated that McCarthney was aware of the circumstances in endorsing the pilot time claims
 
 
 [11]
 The ALJ found, in summary, that "some of these entries in the pilot's logbook were intentionally false" and that McCarthney "endorsed the pilot logbooks of pilots ... as shown on page 2 of the Administrator's Emergency Order of Revocation." There was no appeal as to FAR Part 135 charges against McCarthney which were dismissed
 
 
 [12]
 Devoe testified that she often recorded "two to three months" after the actual flight. She also conceded that she did not keep "real accurate notes" on this, but that McCarthney did not know about this practice, that he entered the contested six hour flight time when she admittedly was not at the controls. She also said that her time records of students instruction were not always in accord with the Hobbs meter or sheets maintained by Omni for inspection purposes. Devoe testified that she had no intention of "pursuing an aviation career."
 
 
 [13]
 The ALJ also found a "non-violation of Section 135.293(a) ... the aforesaid flight was not a Part 135 flight." This determination was not appealed
 
 
 [14]
 This petitioner is referred to as Wood in the Administrator's revocation order and by the ALJ